2023 PA SUPER 56

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br><br>Appellee<br><br>v.<br><br>BEAU REED<br><br>Appellant | IN THE SUPERIOR COURT<br>OF PENNSYLVANIA<br><br><br><br><br>No. 514 MDA 2022 |

Appeal from the Judgment of Sentence Entered November 8, 2021
In the Court of Common Pleas of Tioga County
Criminal Division at No.: CP-59-CR-0000403-2019

BEFORE: STABILE, J., DUBOW, J. and MCCAFFERY, J.

OPINION BY STABILE, J.:                    **FILED: MARCH 31, 2023**

Appellant, Beau Reed, appeals from his judgment of sentence of two to five years' imprisonment for corruption of minors and two counts of indecent assault of a complainant less than sixteen years of age.[1] Appellant argues that the trial court (1) abused its discretion by allowing a text message from Appellant to the minor victim, T.R., into evidence, (2) abused its discretion by denying Appellant's motion for a mistrial, and (3) erroneously denied Appellant's motion to dismiss under Pa.R.Crim.P. 600. We affirm.

The evidence adduced during trial demonstrates that Appellant had a romantic relationship with T.R.'s mother, Tara Ruggles. T.R. is Ruggles' daughter from a prior relationship. Ruggles and T.R. moved into Appellant's

---

[1] 18 Pa.C.S.A. §§ 6301 and 3126, respectively.

residence, and Ruggles gave birth to Appellant's child. In May 2018, five years after their relationship began, Ruggles and Appellant became engaged.

Later, on May 26, 2018, Appellant, Ruggles and T.R., then thirteen years old, attended a picnic in New York and returned home that night. Appellant had been drinking beer all day and remained intoxicated. Ruggles rebuffed Appellant's sexual advances and went to sleep. Appellant then entered T.R.'s bedroom, got into her bed, and rubbed her vagina with his finger. He left T.R.'s room but returned shortly thereafter and touched her in the same manner as before. The following afternoon, T.R. described the incidents to Ruggles. Ruggles and T.R. immediately moved out of Appellant's house and never lived there again.

On August 5, 2019, Appellant was arrested and charged with corruption of minors, indecent assault and aggravated indecent assault. Multiple continuances followed which we will delineate below in our discussion of Appellant's Rule 600 argument. Prior to trial, Appellant moved to dismiss all charges under Rule 600, but the court denied the motion.

On July 29, 2021, the court presided over a one-day jury trial. It does not appear from the record that any party requested that the court sequester witnesses or that the court did so on its own. Ruggles testified before the lunch break, and T.R. testified after the break.

During Ruggles' testimony, over Appellant's objection, the Commonwealth introduced a text message that Appellant sent T.R. and Ruggles in a group chat several weeks after the assault. The text message

stated, "[T.R.,] . . . let me apologize to you from the deepest depths of my heart." Commonwealth Ex. 1.

During Ruggles' testimony, defense counsel elicited her admission that Appellant accused her of cheating on him around the time that they became engaged. N.T., 7/29/21, at 69. Following the lunch break, T.R. took the stand. T.R. testified that during the lunch break, Ruggles told T.R. that Appellant claimed Ruggles cheated on Appellant at some point. *Id.* at 108. T.R. stated that she was not aware until "today" about Appellant's accusation. *Id.* Appellant moved for a mistrial on the ground that Ruggles and T.R. discussed Ruggles' testimony during trial. The Commonwealth recalled Ruggles to the stand, and she admitted telling T.R. during the lunch break about Appellant's accusation. *Id.* at 120. Ruggles added that she neither talked to T.R. about anything else in Ruggles' testimony nor told T.R. what to say in her own testimony. *Id.* at 120-21. The court denied Appellant's motion for mistrial.

In its closing argument, the Commonwealth emphasized that Appellant's text message in which he "apologized" for his actions was a confession of guilt for sexually assaulting T.R. *Id.* at 143.

The jury acquitted Appellant of aggravated indecent assault but found him guilty of corruption of minors and two counts of indecent assault. On November 8, 2021, the court imposed sentence. Appellant filed timely post-sentence motions, which the court denied via memorandum and order, and a timely appeal to this Court. Appellant complied with Pa.R.A.P. 1925, and the

court filed a statement incorporating by reference its memorandum denying Appellant's post-sentence motions.

Appellant raises three issues in this appeal:

1. Whether the court erred in admitting a text message into evidence and allowing the reading of it to the jury?

2. Whether the court erred in failing to grant a mistrial as a result of mother and daughter discussing testimony?

3. Whether the court erred in denying [Appellant's] motion for dismissal pursuant to Rule 600 of the Pennsylvania Rules Of Criminal Procedure?

Appellant's Brief at 4.

The text message from Appellant to T.R. and Ruggles in which Appellant "apologize[d]" to T.R. was a crucial piece of evidence in the Commonwealth's case. In his first argument on appeal, Appellant argues that the Commonwealth failed to authenticate the text message. We hold that the trial court correctly ruled that the Commonwealth authenticated the text message, and that the court acted within its discretion by admitting the text message into evidence.

When we review a trial court's ruling on admission of evidence,

decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice,

- 4 -

bias[,] or ill-will, as shown by the evidence or the record, discretion is abused.

***Commonwealth v. Talley***, 236 A.3d 42, 55 (Pa. Super. 2020).

Pennsylvania Rule of Evidence 901 governs the authentication of evidence and authentication prior to the admission of electronic evidence. ***See Commonwealth v. Murray***, 174 A.3d 1147, 1157 (Pa. Super. 2017). Rule 901(a) provides, "Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides in relevant part:

The following are examples only—not a complete list—of evidence that satisfies the requirement:

.   .   .

*(11) Digital Evidence.* To connect digital evidence with a person or entity:

(A) direct evidence such as testimony of a person with personal knowledge; or

(B) circumstantial evidence such as:

(i) identifying content; or

(ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(b)(11).[2] "Digital evidence" includes "text messages." Comment, Pa.R.E. 901. "The proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." *Id.* "Circumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication [but such evidence may be enough] in combination with other evidence of the author's identity." *Id.* Such circumstantial evidence includes, for example, testimony from the person who sent or received the communication or contextual clues in the communication tending to reveal the identity of the sender. *Jackson*, 283 A.3d at 819.

Rule 901(b)(11) is consistent with decisions in which Pennsylvania courts have held that the content of text messages provide circumstantial evidence that the defendant wrote them. *See Commonwealth v. Orr*, 255 A.3d 589 (Pa. Super. 2021) (collecting cases); *id.* at 601 (circumstantial evidence demonstrating that defendant sent threatening text messages to murder victim on night of murder and throughout month prior was sufficient to authenticate text messages in first-degree murder trial; defendant's girlfriend purchased and gave defendant cell phone used to send the

---

[2] Rule 901(b)(11) became effective on October 1, 2020, prior to Appellant's trial. Accordingly, it applies to this case. *See Commonwealth v. Jackson*, 283 A.3d 814, 818 & n.12 (Pa. Super. 2022) (applying Rule 901(b)(11) when defendant's trial took place after its effective date).

messages, phone was found with defendant's other belongings at time of arrest, defendant and victim were involved in custody dispute over children, and content of messages indicated defendant wrote them since multiple messages focused on custody dispute).

The Commonwealth's first witness during trial, State Trooper Evanchick, testified that in April 2019, the Pennsylvania State Police received a report that Appellant had sexually abused a thirteen-year-old named T.R. N.T., 7/29/21, at 24. On May 7, 2019, Trooper Evanchick interviewed Ruggles. *Id.* During the interview, Ruggles brought up a text message on her cell phone and showed it to the trooper. *Id.* at 30. Ruggles then sent an email to the trooper attaching the text message, and the trooper printed a copy of the message. *Id.* at 31.

Ruggles, the next witness, testified that prior to Memorial Day 2018, she had a five-year relationship with Appellant, and they had become engaged at the beginning of May 2018. *Id.* at 40. Appellant and Ruggles had a son together, "J." Ruggles and Appellant lived together with T.R., J. and Appellant's mother. *Id.* at 41-42. Ruggles testified that Appellant drank heavily and was intoxicated "too many times" for Ruggles to count. *Id.* at 45.

On Saturday of Memorial Day weekend, Appellant and Ruggles attended a picnic with T.R. and J. They returned home that night. Appellant was intoxicated and attempted to have intercourse with Ruggles, but she rebuffed his advances and went to sleep. *Id.* at 45-46. On Sunday, T.R. told Ruggles

that Appellant had assaulted her the previous night. *Id.* at 48-49. Ruggles and T.R. immediately moved out of Appellant's house. *Id.* at 49-50. Ruggles' son remained with Appellant part-time, so Ruggles continued to communicate with Appellant concerning their son. *Id.* at 50.[3]

Ruggles testified that Appellant sent her and T.R. a text message. *Id.* at 51-52. Ruggles knew that the text message was from Appellant "because it's a group chat and one picture is a picture of my daughter and the other picture is a picture that I put as [Appellant's] profile picture - and if I had glasses, or could see, I could tell you what it says." *Id.* at 52. Ruggles testified:

> Q: Okay, so you know that to be his profile picture?
>
> A: Yes.
>
> Q: Because you made chat profile picture?
>
> A: I put it there, yes.
>
> Q: And, I'm assuming, prior to this - you were in a relationship with him - you probably sent other messages to and from?
>
> A: Correct.
>
> Q: Was that profile picture always visible when he sent you a message?
>
> A: Yes. It wasn't always the same, the same picture. But after we split up, that was the profile picture I put there.

---

[3] *See also id.* at 69 (Ruggles continued to communicate with Appellant until April 2019 because "we had a child in common").

Q: Okay. So, is that because - why would you have changed that, I guess?

A: Because it talks about reacting to people who are trying to push your buttons.

Q: Okay.

A: And that no reaction is the best reaction.

*Id.* The prosecutor inquired whether anyone else would have known about the details in the text message. Ruggles shook her head no. *Id.* at 53. She then testified:

Q: Why would nobody else have known that?

A: Because it . . . was shortly after, and we didn't talk about it. My daughter [T.R.] didn't. She didn't want to talk about it, so we didn't. I mean we didn't talk about it to anybody.

Q: Okay, so you hadn't told anyone? There's no way anyone else would have known that information that's within that message?

A: Correct.

*Id.* at 53.

Defense counsel objected to admission of the text message on the ground that it lacked proper authentication. The court overruled the objection and admitted it into evidence.

The text message was dated, "Mon, Jun 18," and it stated:

[T.R.], let me start by thanking you! You brought so much joy in my life and I will never forget the memories we have. Now let me apologize to you from the deepest depths of my heart... I put you through things that no child should ever be put through! Although we all know I was thinking it was your mother, that is no excuse and your mother is 1000% right for getting out... and—never ever think that the hard times we are all going through right now is in

anyway your fault... never!!! I feel it's better for your brother if me and your brother if me and your mother cut all ties and never speak again. So sadly this is a good bye to you also. I have loved you since the first time you came to Blossburg and I will never stop loving you, I know your going to do great things in life and I wish you all the best, you truly are an amazing young woman and I'm a better man for knowing you... I love you always.

And I'm sorry I said those things about your dad in front of you!! I'm sure he's a great guy, he seemed it the two times I met him. Please forgive me for that!

Commonwealth Ex. 1.

T.R. testified after the court admitted the text message into evidence, and she stated that Appellant apologized to her twice after the assault. One apology was in person when Appellant took T.R. shopping. While stopped at a red light, he "apologiz[ed] for everything that he put us through, and put me through." N.T., 7/29/21, at 96. The other apology was in "a group text that I was a part of, and he addressed the text to me apologizing, saying that I shouldn't have gone through that and all that nonsense." *Id.* at 97.

Friction between Appellant and Ruggles continued after their separation. In April 2019, Appellant filed a report with Child Protective Services ("CPS") in New York alleging that Ruggles physically abused J. N.T., 7/29/21, at 64. Following Appellant's complaint to CPS, Ruggles reported Appellant's assault on T.R. to the Pennsylvania State Police. *Id.*

Contextual clues in the text message, in conjunction with Ruggles' and T.R.'s testimony, provide ample evidence to authenticate the text message as a communication from Appellant under Rule 901(b)(11)(B)(ii). The text

message came from a device that Appellant possessed and controlled, since the profile picture that Ruggles created for Appellant's text messages appeared at the top of the message. Ruggles testified that the profile picture was uniquely suited to Appellant, because the words in the profile picture referred to "reacting to people who are trying to push your buttons," an allusion to their turbulent relationship. Both Ruggles and T.R. testified that they received the text message during a group chat with Appellant. The words in the text message ("Now let me apologize to you from the deepest depths of my heart... I put you through things that no child should ever be put through!") were similar to Appellant's words in person to T.R. while they were shopping (Appellant "apologiz[ed] for everything that he put us through, and put me through").[4] The message mentions a series of family issues, including (1) the fact that Ruggles "[got] out" of the relationship, (2) the "hard times we are all going through right now," (3) the presence of a "brother" in the family (Appellant's and Ruggles' young son and T.R.'s half-brother), (4) the suggestion that Appellant and Ruggles "cut all ties and never speak again," (5) Appellant's love for T.R., (6) Appellant's negative remarks about T.R.'s father, (6) the fact that Appellant met T.R.'s father twice, and finally, (7) Appellant's statement that "[I] apologize to you from the deepest depths of

_____

[4] Although the Commonwealth did not mention this detail in its brief, we may affirm the trial court's decision on any basis that is supported by the record. ***In Re A.J.R.-H***, 188 A.3d 1157, 1175-76 (Pa. 2018).

my heart... I put you through things that no child should ever be put through." Appellant is the person most likely to have authored a message to Ruggles and T.R. that mentioned this combination of sensitive issues. Indeed, it is unlikely that anyone other than Appellant, Ruggles and T.R. would have known about this array of issues, because T.R. did not want to talk about the incident with Appellant, and Ruggles and T.R. did not discuss it with anybody. The date of the message, "Mon, Jun 18," is noteworthy as well. The most recent year in which June 18th fell on a Monday was 2018,[5] and June 18, 2018 fell several weeks after the events referenced in the text message. An apologetic text message on this date fits logically within the chronology of this case.[6] Viewed collectively, this evidence demonstrates that the trial court properly overruled Appellant's objection to the authenticity of the text message.

In his second argument, Appellant contends that the trial court abused its discretion in denying his motion for mistrial due to the conversation that Ruggles had with T.R. during the lunch break before T.R.'s testimony in the one-day trial. The trial court properly denied this motion on the ground that Appellant suffered no prejudice.

A motion for mistrial

is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such nature that its unavoidable effect is to deprive the appellant of a

---

[5] 2012 is the only other year after 2010 in which June 18th fell on a Monday.

[6] **See** n.4, **supra**.

- 12 -

fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for mistrial.

*Commonwealth v. Tejada*, 834 A.2d 619, 623 (Pa. Super. 2003). "A mistrial is an extreme remedy only warranted when the prejudice to the movant cannot be ameliorated to ensure a fair trial." *Commonwealth v. Risoldi*, 238 A.3d 434, 458 (Pa. Super. 2020).

The trial court reasoned that Ruggles' conversation with T.R. at the lunch break did not prejudice Appellant:

> [I]t is undisputed that [] Ruggles made a statement to her daughter while they ate lunch together over the lunch recess— which occurred after [] Ruggles testified but prior to her daughter's testimony—that the defense claimed that at some point in time she cheated on [Appellant]. [] Ruggles admitted to making the statement. Yet, [] Ruggles was unequivocal in that she neither talked to her daughter about anything else in her testimony nor talked to her daughter about what to testify to. Moreover, [] Ruggles testified she was not present in the courtroom when her daughter testified and had no idea what she testified to.

Trial Court Memorandum Denying Post-Sentence Motions, 3/4/22, at 6. It was within the trial court's discretion to reach this conclusion. Although it does not appear any order of sequestration was in effect pursuant to Pa.R.E. 615,[7] the fact that Ruggles discussed her testimony with T.R. before T.R.

---

[7] Pa.R.E. 615, regarding sequestering witnesses, provides:

> At a party's request the court may order witnesses sequestered so that they cannot learn of other witnesses' testimony. Or the

*(Footnote Continued Next Page)*

testified necessarily raised an issue of prejudice. Nevertheless, the subject of the discussion, Ruggles' alleged cheating, was not central to this case, and there was no evidence that Ruggles discussed anything more important with T.R. Accordingly, the trial court properly determined that Ruggles' mention of the cheating issue to T.R. before T.R.'s testimony did not deprive Appellant of a fair trial.

It must be noted that Appellant conceded in his post-sentence motions that the issue of whether Ruggles cheated on Appellant was not critical to his innocence or guilt. Trial Ct. Mem. at 7. Appellant insisted, however, the fact that Ruggles told T.R. about this issue during trial "demonstrated [Ruggles'] desire to see Appellant convicted." ***Id.*** (citing Appellant's Brief In Support Of Post-Sentence Motions at 11).[8] The trial court disagreed, stating:

_____

court may do so on its own. But this rule does not authorize sequestering:

 (a) a party who is a natural person;

 (b) an officer or employee of a party that is not a natural person (including the Commonwealth) after being designated as the party's representative by its attorney;

 (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or

 (d) a person authorized by statute or rule to be present.

The rule is discretionary, not mandatory. ***See*** Comment to Pa.R.E. 615.

[8] Appellant makes the same argument in the same words in this Court. Appellant's Brief at 16.

- 14 -

> The [trial court] disagrees with [Appellant]'s statement the incident "demonstrates [Ruggles'] desire to see the [Appellant] convicted." The Court determines that position to be too big a leap of logic. Moreover, the argument is conclusory in that there is no support in either counsel's brief or the record to substantiate defense counsel's position. If, for example, [Ruggles] desired to see [Appellant] convicted, she would have discussed testimony with her daughter about the incident in the bedroom rather than about a peripher[al] issue. However, [] Ruggles testified, under oath, that she did not discuss anything else from her testimony nor tell her daughter how she should testify. Although [Appellant] does not argue the incident to be a negative against [] Ruggles' credibility, the jury already had occasion to assess [] Ruggles' credibility since the incident happened after she testified. Furthermore, the jury would have been able to factor this peripher[al] issue into its reassessment of [] Ruggles' credibility since the information came to light in their presence through the victim's testimony.

*Id.* The court found that the incident during the lunch break was at most "harmless error." *Id.* We agree with the trial court's perceptive analysis that the matter was peripheral. Indeed, Appellant implicitly concedes that the issue was peripheral by admitting that it was not critical to his guilt or innocence.

Finally, Appellant argues that the court abused its discretion by denying his motion to dismiss under Rule 600. We disagree.

When presented with a speedy trial claim arising under Pennsylvania Rule of Criminal Procedure 600, our standard of review is well settled.

> In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly

- 15 -

unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters ..., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

***Commonwealth v. Bethea***, 185 A.3d 364, 370 (Pa. Super. 2018). The Commonwealth bears the burden of proving, by a preponderance of evidence, that it acted with due diligence throughout the proceedings. ***Commonwealth v. Kearse***, 890 A.2d 388, 393 (Pa. Super. 2005).

Rule 600 provides that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). In computing the Rule 600 deadline, however, we do not necessarily count all

- 16 -

time following the filing of the complaint. Rather, "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1). Rule 600 expressly excludes from computation periods of delay resulting from "any continuance granted at the request of the defendant **or the defendant's attorney**." Pa.R.Crim.P. 600(C)(3)(b). Continuances based on joint requests by the Commonwealth and the defendant are excludable time under this rule. *Commonwealth v. Hunt*, 858 A.2d 1234, 1243 (Pa. Super. 2004) (*en banc*).

> The Rule 600 analysis entails three steps:
>
> First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any, to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600([D]). As we have explained, Rule 600[] encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date. Addition of any Rule 600[] extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.

*Commonwealth v. Wendel*, 165 A.3d 952, 956–57 (Pa. Super. 2017).

Here, the complaint was filed on August 5, 2019, and trial took place 725 days later, on July 29, 2021. The court calculated the adjusted run date

as September 4, 2021, Appellant's Brief at 16, and determined that 311 of these days were chargeable to the Commonwealth and 414 were chargeable against Appellant.

The only time period discussed in Appellant's brief is the continuance from the scheduled trial date of August 12, 2020 to the scheduled date of December 9, 2020. *Id.* The court held that this time was chargeable against Appellant because the Commonwealth and defense counsel filed a joint request for a continuance on August 10, 2020. Trial Court Memorandum Denying Post-Sentence Motions, 3/4/22, at 12. Appellant argues that he himself objected to this continuance and demanded that the case proceed immediately to trial. Therefore, Appellant was not bound by his attorney's consent to a continuance, and the time period between August 10 and December 9 was chargeable to the Commonwealth. As a result, Appellant concludes, the Commonwealth violated Rule 600 because it was responsible for more than 365 days of delay.

Based on our review of the record, we disagree with Appellant. During a pretrial hearing on August 10, 2020, defense counsel advised:

> [t]hey brought [Appellant] down - he was scheduled for guilty pleas, but we're not going to enter any guilty pleas today. And it's got to the point where I can't properly represent him. We can't agree on the best way to proceed. I can no longer represent him effectively, and I filed a petition to withdraw.[9]

---

[9] Subsequently, defense counsel withdrew his appearance, and a different attorney represented Appellant at trial than the attorney who represented him on August 10, 2020.

N.T., 8/10/20, at 1. Appellant stated that he objected to counsel's withdrawal from the case, and he insisted that he was ready to proceed to trial immediately. *Id.* at 2. Counsel responded that "[because] of the possible plea agreements we were trying to reach, I have not subpoenaed an appropriate number of witnesses to proceed on Wednesday [August 12]." *Id.* at 5. The Commonwealth stated that "my victim [presumably T.R.] is either in or on the way back from the state of Florida . . . so we can't have her in here [for trial] anyway [because] she'd need to quarantine." *Id.* Both counsel requested leave to file a motion for continuance, and the court said that they were welcome to submit it. *Id.* at 7.

Later that day, the Commonwealth and defense counsel filed a joint request for a continuance. The Commonwealth stated that it needed a continuance because its juvenile witness needed to be in COVID-related quarantine for fourteen days because she had traveled to several southern states. Motion For Continuance, 8/10/20, at ¶ 3. Defense counsel stated that he needed a continuance because he "[did] not feel he can effectively represent [Appellant] at trial." *Id.* at ¶ 4.

The continuance from August 12 to December 9 is chargeable against Appellant on two grounds: the continuance was requested by defense counsel, Pa.R.Crim.P. 600(C)(3)(b), and it was a joint request for a continuance with the Commonwealth, *Hunt*, 858 A.2d at 1243. The trial court acted within its discretion by granting a continuance to the Commonwealth and defense

counsel, since T.R. was unavailable for trial due to COVID quarantine requirements, and since it appears that a breakdown had taken place in defense counsel's relationship with Appellant that impaired the effectiveness of counsel's representation. Under these circumstances, the fact that Appellant insisted he was ready for trial does not cast doubt on the court's decision.

For these reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/31/2023